## Kentucky & Tennessee Railway Company v. Ball.

(Decided May 15, 1917.)

### Appeal from McCreary Circuit Court.

1. Carriers—Passenger on Mixed Train—When Company Liable For Injury To.—Railroad companies are not held to the same high degree of care in the operation of mixed trains as they are in the operation of regular passenger trains, but if a passenger on a mixed train is injured by the negligence of the railroad company, no matter in what this negligence consists, he has the same right of recovery as if injured by the negligent operation of a regular passenger train.

2. Carriers—Operation of Mixed Passenger and Freight Trains—Care to be Exercised For Safety of Passengers.—In the operation of mixed passenger and freight trains a railroad company is under a duty to exercise the highest degree of care that is usually and practicably exercised and consistent with the operation of trains of that nature.

3. Carriers—Operation of Mixed Trains—Burden of Proof.—Where a passenger on a mixed train is injured by an accident to the train, he may rest his case when he shows the accident and resulting injury, although he may not be able to explain how it happened or what caused the accident to the train. It is incumbent upon the railroad company to show that the accident was such a one as is ordinarily incidental to the operation of a mixed train when it is being operated with the highest degree of care that is usually and practicably exercised in the operation of such trains.

J. N. SHARP, WILLIAM WADDLE and O. H. WADDLE for appellant.

JOHN W. SAMPSON, STEPHENS & STEELEY and JOHN W. RAWLINGS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellee, Mary Ball, claiming that she was injured while riding as a passenger in a passenger coach, which was a part of a mixed freight and passenger train owned and operated by the appellant railway company, when the train came to a sudden and violent stop, brought this suit to recover damages.

After the pleadings had been made up, there was a trial before a jury, resulting in a verdict for three thousand dollars in favor of Mrs. Ball. The judgment on this verdict we are asked to reverse for reasons that will be stated in the course of the opinion.

Mrs. Ball testified, in substance, that on the 26th day of August, 1914, she and her six little children were rid-

ing in a passenger coach attached to a freight train. Asked what happened that caused her to be injured, she answered: "Just an unusual and unnecessary stop. Q. Was it a quick, sudden stop? A. Yes, sir." She said that when the train stopped she was thrown against the arm of the seat and one of her ribs and her abdomen and kidneys were seriously injured. That her little baby was pitched out in the aisle of the car about six feet from where he was sitting. That she went that day to her sister's, where she was sick for a few days. That afterwards she went home and in November was overcome with a sudden illness that resulted in a miscarriage. That from the effects of the injury and the miscarriage her health was seriously impaired. That shortly after the accident happened the conductor came to where she was in the train and picked up her baby which had been thrown out on the floor. That she was in bed from the 14th of November until the last of December. That she had a case of chickenpox before her miscarriage and was confined to her bed several days with it.

Bill Miller, a witness for Mrs. Ball, was a passenger on the train, and said it made "a little bit of a sudden stop. That is all I know. It stopped pretty tolerably quick." The witness did not know what caused it to make the stop, nor did he notice Mrs. Ball, who was in the same coach, or know that she had been in any way hurt, although he heard one of the children crying after the train stopped.

Mrs. Sellers and Mrs. Shelton, the latter being the mother of Mrs. Ball, testified as to her illness and inability to work, but did not know anything about the alleged accident on the train or what caused Mrs. Ball to be in ill health.

Dr. Seviers, a witness for Mrs. Ball, was called to see her in November or December, 1914, and found her suffering from a hemorrhage of the womb. He expressed the opinion that she had had a miscarriage and that one of her ribs was fractured, but was not sure of that, although Mrs. Ball said she suffered from it. This witness was also asked if the train on which Mrs. Ball was riding in August had come to a sudden and unusual stop, in consequence of which she was thrown over the arm of the seat in which she was riding, being at the time pregnant, would that have caused a miscarriage? And he said: "Well, of course a blow could cause a miscarriage." He

also said that a bad case of chickenpox would have a tendency to bring on a miscarriage if the person was not well taken care of.   This was all the evidence for Mrs. Ball.

On behalf of the railway company Mrs. Phillips, a next-door neighbor of Mrs. Ball, testified that some time after Mrs. Ball claims to have been hurt on this train, she talked with her frequently and never heard her make any complaint about being hurt on the train, and further said that up until the time she had the chickenpox she did her own household work, including the washing and scrubbing. That she had a very severe case of chickenpox, followed by a miscarriage. That Mrs. Ball did not attribute her miscarriage to any injury she received on the train, or mention any train accident, but did tell her about her baby being thrown out of the seat.

Dr. Fitzpatrick testified that he was called in to treat Mrs. Ball for chickenpox, and said she had as severe a case as he ever saw, being confined to her bed from ten days to two weeks.   That about the time, or after she recovered from the chickenpox, he was called to see her one night and found her in a serious condition from flooding, and was informed that she had miscarried, but said he was not present when the miscarriage took place.   He expressed the opinion that the chickenpox was the cause of her miscarriage, and also said that Mrs. Ball did not say anything to him about any injury she received on the train.

Dr. Smith, who was called in by Dr. Fitzpatrick to assist him in stopping the flooding, was also of the opinion that she had a miscarriage, and attributed it to the chickenpox from which she had lately suffered. He said she discussed with him the chickenpox, but did not say anything about having been injured in the railroad accident or on any railroad train.

Miss Keith testified that Mrs. Ball told her that her baby was thrown out of her lap on account of a jerk of a train on which she was riding in August, but did not mention receiving any injury or hurt herself.

Henry Keith testified that Mrs. Ball told him about her baby being thrown out of her lap by a jerk of the train, but said she did not say anything to him about being hurt herself.

These and other witnesses also testified that Mrs. Ball did a good deal of hard work up until the time she was stricken with chickenpox.

Brack Foster, who was conductor on the train on the day Mrs. Ball claims to have been injured, said there was no sudden or unusual stop of the train. That he did not hear Mrs. Ball, or anyone else, complain of being hurt, nor did he take her child off the floor, or see her child on the floor, or know that any child had been thrown on the floor or out of its seat.

Dr. Cundiff, who waited on some of the children of Mrs. Ball in a professional capacity in the fall of 1914, testified that he did not prescribe for Mrs. Ball in any way, nor did she ever say to him that she had received any injuries on the train.

This is the substance of all the evidence, and it will be observed that no witness or indeed substantial circumstance corroborates the statement of Mrs. Ball that she was injured by an "unusual and unnecessary" stop of the train. Counsel for the railway company comment with some severity on the manner in which Mrs. Ball describes the character of the stop, but we may pass the insinuations against the truthfulness of her description with the observation that while her evidence does not disclose any knowledge of legal phraseology, she appears to have been sufficiently familiar with railroad law to enable her to describe with technical exactness the nature of the stop; and we know of no legal obstacle in the way of a witness acquiring information that will qualify him to tell just what happened in such a way as to make out his case, although his testimony may occasion some surprise to opposing counsel.

We may also here observe that it was not incumbent upon Mrs. Ball to show what caused the unusual and unnecessary stop that, according to her statement, produced her injury. It is true she was riding on what is known as a mixed train, but, nevertheless, she was a passenger, and when a passenger is injured on a mixed train by an accident to the train, it is incumbent upon the railroad company to show that the accident was such a one as is ordinarily incidental to the operation of a mixed train when it is being operated with the highest degree of care that is usually and practicably exercised, and consistent with the operations of trains of that nature.

Railroad companies are not held to the same high degree of care in the operation of mixed trains as they

are in the operation of regular passenger trains, but if a passenger on a mixed train is injured by the negligence of the railroad company, no matter in what this negligence consists, he has the same right of recovery as if he were injured by the negligent operation of a regular passenger train.   The law in respect to the duty and liability of the company in the operation of mixed trains is very fully set out in Chesapeake & Ohio Ry. Co. v. Jordan, 25 Ky. L. R. 574, and we adopt what is there stated without repeating it.   So that if a mixed train is stopped suddenly and a passenger is injured on account thereof, the injured passenger may rest his case when he shows a sudden stop and resulting injury, although he may not be able to explain how or what caused it. The company operating the train is presumed to know why a stop of this sort was made, and if it wishes to excuse itself on the ground that it was necessary or unavoidable in the prudent operation of such a train, it must produce evidence in support of this defense.   In this case, however, the defense of the company was that no stop was made that could reasonably be calculated to produce the injury of which Mrs. Ball complains, and of course the company had the right to confine itself to this defense.

It is earnestly urged by counsel for the railway company that on the evidence the court should have directed the jury to return a verdict for the railway company, but we are of the opinion that the evidence of Mrs. Ball, although unsupported, was sufficient to take the case to the jury.   But of course the verdict was flagrantly against the weight of the evidence, as well as against the weight of attending and subsequent circumstances.

It is further urged that the verdict was excessive, but in view of the conclusion we have reached, we do not find it necessary at this time to express any opinion on this subject and expressly refrain from so doing.

In the instructions the court told the jury that it was the duty of the railway company to exercise the highest degree of care to so manage and operate its trains as to make the passage of plaintiff reasonably safe, and that if they believed from the evidence that the company failed to exercise this degree of care, and that by reason of its failure the train was caused to or did make a sudden stop or jerk, which threw plaintiff across the arm of the seat of the coach and injured her, they should find for the plaintiff.

This instruction would have been proper if the train on which Mrs. Ball was riding had been a regular passenger train, but as it was a mixed train the jury should have been instructed in conformity with the law as laid down in the Jordan case.

Wherefore, the judgment is reversed, with directions for a new trial not inconsistent with this opinion.